625 So.2d 600 (1993)
Rosa Lee BERRY, Plaintiff-Appellant,
v.
STATE of Louisiana through DHHR, Defendant-Appellee.
No. 92-1479.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1993.
*602 F. Jean Pharis, Alexandria, for Rosa Lee Berry.
James Dey Kirk, Natchitoches, for State, DHHR.
Before STOKER, LABORDE and YELVERTON, JJ.
STOKER, Judge.
This case presents two issues for our review:
1. Whether the defendant, State of Louisiana, through the Department of Health and Human Resources, Office of Family Security (DHHR) was the employer of Robert Allen, d/b/a Broadway Transportation Service, so as to impose liability on defendant for Allen's employee's negligence which resulted in personal injuries to plaintiffRosa Lee Berry; and
2. Whether the defendant is responsible to plaintiff for failing to insure that Allen was adequately protected by liability insurance coverage, bonds, or personal resources from which plaintiff could recover for her personal injuries.

FACTS
On June 5, 1987, Berry and her foster son, Bryant Cheatham, Jr., were riding in a van owned by Allen and driven by Allen's employee. Allen was enrolled as a provider of "medically necessary nonemergency transportation" with defendantState under the authority of Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 et seq. and was providing such transportation services to plaintiff and Cheatham. Cheatham required kidney dialysis. Cheatham was also mentally retarded and required the assistance of plaintiff. The van struck a parked automobile as it was transporting plaintiff and Cheatham home after Cheatham's dialysis treatment. Plaintiff sustained personal injuries in the collision.
At the time of the collision, Allen was uninsured or underinsured in violation of defendant's guidelines requiring Allen to have minimum liability insurance of $50,000 per person and $125,000 per accident. Additionally, Allen was discharged in bankruptcy.

TRIAL COURT ACTION
This suit against the defendant followed. The trial court found that plaintiff failed to prove the existence of an employer-employee relationship between the State through DHHR and Allen so as to impose vicarious liability on the State. Additionally, the court held that any alleged failure of defendant to monitor its regulations (to insure Allen had adequate insurance in compliance with its regulations) was not a cause in fact of the accident. The trial court noted that defendant may have deprived plaintiff of a solvent defendant, but did not make findings or award damages in this regard. Thus, the court dismissed plaintiff's demands against defendant, and plaintiff appeals. We affirm the trial court's finding that Allen was not an employee of defendant, but we reverse the judgment to find that plaintiff is entitled to damages for defendant's failure to insure that Allen had adequate liability coverage on the van.

OPINION

Vicarious Liability[1]
Defendant is the designated state agency to administer the State's Medical Assistance *603 Program under provisions of "Title XIX" of the Federal Social Security Act and Article 18, Section 7, Subsection 1, of the Louisiana Constitution, as amended. Part of the program includes the providing of "medically necessary nonemergency transportation" services to qualified recipients. The medically necessary nonemergency transportation program is intended to provide transportation when all other reasonable means of transportation have been explored and found to be unavailable. This transportation is available without cost to the recipient.
Defendant determines Medical Assistance recipient eligibility and enrolls "providers" of the medically necessary nonemergency transportation services. Providers must be enrolled in the Medical Assistance Program in order to receive reimbursement under Title XIX. Defendant is responsible for the arrangement of such transportation for all Title XIX recipients when requested by a recipient or his responsible party or someone acting on the recipient's behalf. The provider is not allowed to initiate a trip without defendant's approval. In instances in which Title XIX funds are authorized to provide transportation, the recipient is given the freedom to choose among providers in his service area who are enrolled. If the recipient does not make a choice, defendant assigns the least expensive transportation suitable to meet the recipient's medical needs. Otherwise, the guidelines provide that trips are to be assigned on a rotating basis to available providers. Providers who advertise their services cannot use the words "free ride" on cards or other handouts and cannot put defendant's telephone number on their advertising.
In arranging transportation, defendant advises the provider of the recipients to be transported and the times of their medical appointments. It appears that a provider may decline to transport recipients and may cancel a commitment to transport. It also does not appear that a provider must confine his transportation services to defendant.
As part of the enrollment, providers are required to abide by guidelines implemented by defendant and are subject to administrative sanctions for failure to comply. The guidelines include requirements that the providers (except those who provide services for one recipient) have minimum liability insurance in an amount set by defendant, file a certificate of insurance with the Bureau of Health Services Financing, submit to vehicle inspections, carry certain equipment, submit to traffic laws, follow certain procedures in emergency situations, as well as other requirements.
The arrangement does not have a set term at the end of which it was no longer valid. The provider can terminate the arrangement at will, but the state can terminate the arrangement only if the provider has violated policies in a way sufficiently egregious to warrant that level of punitive action.
Apparently, Allen was not on salary nor did he receive retirement benefits from the state. Also, Allen was not carried on the state's health insurance plan. Allen was paid a flat fee for pickup plus mileage.
Under Louisiana Law, a principal generally is not liable for the offenses an independent contractor commits in the course of performing its contractual duties. Davis v. State Farm Ins. Co., 558 So.2d 636 (La.App. 1st Cir.1990). However, LSA-C.C. art. 2320 provides in part that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
The single, most important factor to consider in deciding whether the employer-employee relationship exists for purposes of art. 2320 is the right of the employer to control the work of the employee. Roberts v. State, through Louisiana Health and Human Resources Administration, 404 So.2d 1221 (La.1981). Factors to be considered in assessing the right of control are the selection and engagement of the worker, the payment of wages, and the power of control and *604 dismissal. Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188 (La.1977).
"It is the right of control of the time and physical activities in the other party and the existence of a close relationship between the parties which determine that one is a servant....
"Neither jurisprudence nor modern commerce will allow us to define `servant' as one who does only physical acts. `Servant' must be interpreted as that particular kind of agent who has a very close economic relation to, and is subject to very close control by, the principal. A servant is one who offers his personal services for a price. He is an integral part of his employer's business and must submit to the control of his physical conduct as well as of his time."
Blanchard v. Ogima, 253 La. 34, 215 So.2d 902, 905 and 906 (La.1968).
On the other hand,
"It is well understood by the courts of this State that the term independent contractor connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants. The relationship presupposes a contract between the parties, the independent nature of the contractor's business and the nonexclusive means the contractor may employ in accomplishing the work. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach. Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955).
"The law further recognizes that inquiry to determine whether a relationship is that of independent contractor or that of mere servant requires, among other factors, the application of the principal test: the control over the work reserved by the employer. In applying this test it is not the supervision and control which is actually exercised which is significant, the important question is whether, from the nature of the relationship, the right to do so exists. Amyx v. Henry & Hall, ibid." (Emphasis supplied.)
Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385, 390-391 (La. 1972).
The trial court did not err in finding that plaintiff failed to prove an employer-employee relationship between defendant and Allen. Defendant lacked the requisite right of control and the close economic relation to Allen as set forth by Blanchard, supra.
First, while the defendant had to authorize the transportation and enroll the providers, the recipient could request a certain provider so that the defendant would not necessarily select and engage the provider for the service. A provider could decline to transport a recipient and apparently did not have to confine his business to defendant. Defendant did not supervise the providers.
That defendant required providers to have minimum liability insurance in a specified amount, to abide by safety rules and guidelines, and to submit to vehicle inspections is not necessarily indicative of an employer-employee relationship. cf. Roberts, supra; Davenport v. Amax Nickel, Inc., 569 So.2d 23 (La.App. 4th Cir.1990), writ denied, 572 So.2d 68 (La.1991).
Additionally, defendant's right to suspend or revoke a provider's eligibility to participate in the program for violations of rules and guidelines must not be confused with the employer's right of dismissal. cf. Roberts, supra.
Furthermore, Allen did not have the "very close economic relation to" defendant as to justify a finding of employee status. The defendant did not benefit economically from the relationship with Allen. Rather, defendant was administering a medical assistance program and allowing Allen to transport recipients *605 for a fee paid at least in part through Title XIX funds which Allen would not have been able to collect otherwise from the recipients. In other words, Allen was allowed to increase his customer base through participation in the program. cf. Roberts, supra. The reciprocal benefit to defendant was administration of the program to the recipients.
We affirm the trial court's finding in this regard.

Defendant's Negligence
Defendant's guidelines as found in the "Provider Manual" and "Medical Transportation Application and Annual Update Form" required providers (except those who provide services for only one recipient) to have minimum liability insurance of $50,000 per person and $125,000 per accident. New providers were required to attach a certificate of insurance in which the insurer agreed to notify defendant in the event the policy was cancelled. Apparently, defendant's policy was to either refuse enrollment or to refuse to allow providers to bill defendant if the provider did not provide the proper certificate.
Allen listed three vehicles with defendant, including the van. However, defendant's file did not contain a certificate of insurance on the van. Apparently, Allen had a binder on the van with a company that could not insure it. Allen did not inform defendant that insurance had never been issued. Rather, Allen procured limited insurance through State Farm, but nevertheless did not submit this information to defendant. State Farm insured the van for personal use but Allen thought he had coverage for his business use as well. According to the record, defendant took no action regarding Allen's failure to provide the certificate of insurance.
In its reasons for judgment, the trial court stated that "the alleged negligence may have deprived the plaintiff of a solvent defendant, but it did not contribute to the actual cause of the accident itself." Plaintiff states in brief that she has never contended that the state's actions caused the accident. Rather, plaintiff contends that the duty was to make sure that there was insurance coverage so that the appellant could recover in the face of negligence by a licensed transporter. In other words, is the state responsible for the failure of the tortfeasor, Allen, to respond in damages through insurance that plaintiff would have been able to recover but for the state's failure to make certain that Allen had adequate insurance on the van?
Initially, we consider the trial court's holding that the failure of DHHR to make certain that Robert Allen had the required automobile insurance was not a cause in fact of the accident. The briefs discuss Fowler v. Roberts, 556 So.2d 1 (La.1989) and Guillot v. Sandoz, 497 So.2d 753 (La.App. 3d Cir.1986), writ denied, 501 So.2d 217 (La.1987).
In Fowler the supreme court held the state liable because it negligently issued a driver's license to a seizure-prone driver who thereafter suffered a seizure while driving which resulted in physical injury to the plaintiffs in the Fowler suit. However, the supreme court accepted the trial court's conclusion that the seizure-prone driver would not have driven his car if he had not been issued a license because the driver and his wife so testified, and the trial judge observed that the driver exhibited a "great sense of right and wrong."
Guillot v. Sandoz, supra, is quite distinguishable. Guillot involved a suit against the state founded on the failure of the Louisiana Department of Public Safety to suspend the driver's license of a motorist whose driving caused the death of one party and injury of another. The Department admitted that the license of Guillot should have been suspended because of Guillot's abominable driving record. The trial court found that the failure of the Department to suspend the license was not a cause-in-fact of the accident. The plaintiffs argued that if Guillot's license had been suspended, he would not have been driving at the time of the accident. The trial judge rejected this argument and concluded that it was just as likely that he would have continued to drive and suspending the license would not have prevented him from doing so.
The record contains nothing to indicate that Robert Allen would have desisted from using his uninsured vehicle in his medical transport service had DHHR instructed him not to do so. The trial court was correct in *606 holding that the failure of DHHR to properly monitor Robert Allen's operation was not a cause-in-fact of the accident.
Having established that there was no relationship or association between the lack of the proper and required insurance on the Robert Allen vehicle and the accident, we move to the real basis for plaintiff's claim against the State through DHHR. Under the plaintiff's theory, the issue to be decided is whether, having undertaken to require nonemergency medical transport providers to cover their vehicles with specified liability insurance in favor of patients (and necessary parties transported with patients), the state incurs liability to such transported parties who are injured where the State through DHHR knows that a vehicle it has approved and licensed is not insured as required.
Factually, there is no dispute as to the knowledge on the part of DHHR that Robert Allen's vehicle, the one involved in this case, was being used by him in his medical transport service. The information was contained in the file maintained by DHHR on Robert Allen. Clearly, the administrators and employees of DHHR lapsed in their assumed duty to require that the proper certificate of insurance be provided on that vehicle.
We do not have before us a situation in which a licensed medical transport provider who is licensed as to one or more particular vehicles chooses to operate another vehicle which he has not insured and of which fact DHHR has no knowledge. Here DHHR had knowledge that Robert Allen was using the vehicle involved in the accident, and it failed to require him to provide evidence of proper insurance coverage. To illustrate what is not before us, and which situation we do not pass on, suppose the following example: A becomes licensed as a nonemergency medical transport provider on vehicle 1 as to which he has furnished DHHR with the proper certificate of insurance. However, A also owns vehicle 2 on which he has no insurance. A routinely uses both vehicles 1 and 2 to fulfill assignments from DHHR to transport patients. The case before us does not concern the question of whether DHHR has a duty which extends to checking what vehicles A may be using in his transport service and whether or not they are all insured as reflected in DHHR records. That question is not before us. Our inquiry in this case is confined and limited to the actual factual context before us in which Robert Allen utilized a vehicle as to which the records of DHHR reflected proper insurance had not been put in force. To be more specific, we do not decide how far DHHR is required to go to enforce its policy of requiring medical transport providers to furnish automobile insurance for the protection of clients of medical transport providers.
In Louisiana the courts approach the question of responsibility of one party for the tort of another which injures a third party through the traditional duty-risk approach and the existence of a special relationship. The duty-risk approach consists of the well understood factors of cause-in-fact, existence of duty, breach of duty and inclusion within scope of duty. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289 (La.1993).

Cause-In-Fact
DHHR records reflected that Robert Allen was operating the vehicle in which plaintiff was injured as a nonemergency medical transport vehicle. Had DHHR properly carried out its required duties, it would have rescinded Robert Allen's license to operate and would not have referred patients and their attendants to him, nor would it have approved payment for services rendered by him. Under such circumstances, Robert Allen would have provided proper insurance or discontinued his service. Therefore, DHHR's failure was clearly a contributing cause-in-fact of the failure of Robert Allen to have insurance in force.

Duty, Breach of Duty and Scope of Duty
The Louisiana Supreme Court recently observed that "where the alleged wrongful conduct of the defendant is a failure to act or `nonfeasance,' courts have found it necessary for some definite relationship between the parties to exist, such that social policy justifies the imposition of a duty to act upon the defendant." Fox v. Bd. of Sup'rs of La. *607 State Univ., 576 So.2d 978, 981 (La.1991). Fox and other cases refer to the required connection as a "special relationship." See Pitre v. Louisiana Tech University, 596 So.2d 1324 (La.App. 2d Cir.1992)[2]; Miller v. Everett, 576 So.2d 1162 (La.App. 3d Cir.1991); L.P. v. Oubre, 547 So.2d 1320 (La. App. 5th Cir.), writ denied, 550 So.2d 634 (La.1989); and Smith v. Orkin Exterminating Co., Inc., 540 So.2d 363 (La.App. 1st Cir.1989).
In L.P. v. Oubre the court recognized the principle that an actor has no duty to control the conduct of a third person so as to prevent him from causing physical harm to another unless a special relationship exists between the actor and the other so as to afford the other a right of protection. In Fox and Pitre the relationship was that of university and student. (The supreme court found that Fox was not an LSU student and there was no other basis for a special relationship.) In Miller this court found there was no special relationship between a church pastor, who counseled a church youth director who molested children, and the children's parents. We found the pastor had no duty to warn the parents because the prior molestations had not occurred in connection with the youth director's church activities. In Oubre the Fifth Circuit found a special relationship where a scoutmaster molested plaintiff's sons who were members of the troop. There was a special relationship between the parties wronged and the Boy Scouts of America, its insurer, sponsor and others. In Smith there was a special relationship between Orkin and a homeowner so that Orkin owed a special duty to a customer where Orkin's employee unlocked one of the customer's windows so he could later return and sexually assault her.
Considering the application of the special relationships discussed above, we have no hesitancy in finding that the State of Louisiana through DHHR has a special relationship with patients and their attendants relative to monitoring the provision of liability insurance on vehicles licensed by DHHR to transport them. As noted above, patients entitled to reimbursement for travel and transportation expenses through DHHR were obligated to use transportation facilities operators licensed by DHHR.
In addition to the duty arising from a special relationship there is the principle that when an obligation of supervision is undertaken, a duty of reasonable care is owed. L.P. v. Oubre, supra at page 1324. The principle is similar to the rule that, although there is no duty to protect others from criminal activities of a third person, when such a duty is assumed, liability may result from a negligent breach of that duty. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).
In its brief, the State through DHHR, cites three cases for the general proposition that an injured plaintiff has no cause of action against a party, such as an insurance agent, who negligently fails to cover a tortfeasor with liability insurance. The cited cases are Lebouef v. Colony Ins. Co., 486 So.2d 760 (La.App. 1st Cir.1986), Clark v. Durbin, 590 So.2d 633 (La.App. 3d Cir.1991) and Oliver v. Natchitoches Air Center, Inc., 506 So.2d 558 (La.App. 3d Cir.), writ denied, 507 So.2d 220 (La.1987). Those cases arose in a different factual context from the case before us and are distinguishable. In those cases there was no special relationship between the parties obligated to put liability insurance in force and the injured parties.
Because of the special relationship we find in this case, we find that a duty was owed to plaintiff by the State through DHHR to make certain that all of Robert Allen's vehicles were covered by proper insurance.
It is clear from the facts of this case that the State through DHHR breached its duty owed to plaintiff. It is clear that plaintiff belonged to the class of persons to whom the duty was owed. She was within the scope of the duty. Although plaintiff herself was not the patient, her presence was clearly necessary. It would be ridiculous to hold that a mentally retarded patient who goes to *608 a hospital facility for kidney dialysis should not be accompanied by someone, whether nurse, sitter or as in this case, a foster parent. Indeed, defendant's "Provider Manual" contains provisions for the use of an attendant to accompany the recipient under certain circumstances. The manual provides that no payment will be made to the transportation provider for transportation of such an attendant, and the provider cannot bill the attendant, patient, or family for the transportation of the attendant.
For the foregoing reasons, the state must answer in damages not to exceed $50,000, the amount of liability insurance DHHR should have required Robert Allen to have in force on the vehicle in which plaintiff was injured.

DAMAGES
Apparently, Allen's van struck a parked automobile and turned over. Plaintiff testified that when the van turned over, it threw her out. She sustained a broken right wrist, an extensive laceration on her forehead, and injury to and decreased vision in her right eye as a result of the collision. Plaintiff was seventy-five years old at the time of the collision. She spent eight days in the hospital.
Dr. Douglas Waldman, orthopedic surgeon, treated plaintiff for her wrist injury. Casts were applied, and the fracture was solidly healed six weeks after the injury. Dr. Waldman did not give an estimate of any limitation of motion that plaintiff could expect, but he did state that a person never "comes back" a hundred percent from a wrist fracture. He stated that there is always some stiffness depending on the severity of the fracture and the individual person. However, he did not have any record one way or the other concerning restricted motion in plaintiff's wrist.
Dr. Selcuk Sozen, plastic surgeon, treated plaintiff for her facial lacerations. Dr. Sozen described the laceration in part as an extensive flap-like laceration with the skull exposed. He stated that the laceration commenced over one eye and arched up toward her hairline down to the other eye. Dr. Sozen applied sutures. He stated that she will have a permanent scar, but the scar is not very noticeable. At trial, plaintiff testified that the area of the laceration still feels sore and she has pains on the side of her head.
Dr. Allen D. Smith, opthalmologist, treated plaintiff for her eye injuries. He testified that plaintiff sustained a lot of soft tissue damage in the orbit from the laceration. He testified that externally, there was a lot of swelling and bruising, and some large amounts of conjunctival hemorrhage in the right eye. However, the globe appeared to be intact without rupture at that time. Dr. Smith performed a lateral canthotomy to release pressure on the eye.
On plaintiff's first office visit following the accident, her visual acuity was 20/70 in the right eye. Dr. Smith found at this time that her lens had subluxed, but was not totally out of position. Apparently, problems with the optic nerves were also noted. On a subsequent visit, Dr. Smith found that the vision in her right eye was 20/60 and that the lens had subluxed into the anterior chamber. Dr. Smith subsequently removed the lens and placed an intraocular lens in the anterior segment of the eye.
About eleven days after the procedure, plaintiff had only about 20/200 visual acuity, and about twenty-five days after the procedure, plaintiff's vision "was only about count fingers at five feet...." About thirty-nine days after the procedure, plaintiff's vision was down to "count fingers at three feet."
Dr. Smith found that plaintiff had ischemic optic neuropathy. When he last saw plaintiff in 1988, the vision in her right eye had plateaued out at about the 20/100 level.
Dr. Thomas Robinson, opthalmologist, saw plaintiff first on October 9, 1991, and on one other occasion on February 12, 1992. He found that plaintiff's right eye had a visual acuity of "hand motion."
Plaintiff testified that she cannot see out of her right eye and that she had no trouble with either eye before the accident but wore glasses. Both Dr. Smith and Dr. Robinson related at least some of plaintiff's decreased vision in her right eye to the accident.
*609 We fix plaintiff's general damages at $70,000. We find medical expenses totalling $16,297.37. Accordingly, we fix plaintiff's total damages at $86,297.37. Plaintiff may recover $50,000 of the $86,297.37 total from defendant.

DISPOSITION
For the foregoing reasons, we reverse the trial court's dismissal of plaintiff's claim against defendant. We find that defendant is liable to plaintiff for $50,000, the amount of the policy defendant should have insured that Allen provided.
REVERSED and RENDERED.
LABORDE, J., concurs with reasons.
LABORDE, Judge, concurring.
I concur in the results of the majority, but wish to clarify the limited grounds on which the results are achieved.
The majority opinion discusses the requirement of a special relationship between parties to exist where the alleged wrongful conduct of the defendant consists of a failure to act, or nonfeasance. The cases cited by the majority opinion associate a special relationship with some personal relationship or prior contact between the parties. Where such a relationship attaches, liability may be imposed. See Pitre v. Louisiana Tech University, 596 So.2d 1324 (La.App. 2 Cir.1991), writ denied, 604 So.2d 998 (La.1992); Smith v. Orkin Exterminating Co., Inc., 540 So.2d 363 (La.App. 1 Cir.1989); L.P. v. Oubre, 547 So.2d 1320 (La.App. 5 Cir.), writ denied, 550 So.2d 634 (La.1989). In the absence of such a relationship, liability may not be imposed. See Fox v. Bd of Supr's of La. State Univ., 576 So.2d 978 (La.1991); Miller v. Everett, 576 So.2d 1162 (La.App. 3 Cir.1991).
In the instant case, the majority apparently finds that a special relationship arises between DHHR and patients receiving benefits under the Social Security Act and their attendants based on two factors: (1) the state's failure to determine whether the licensed transportation provider was insured; and (2) the state's active involvement in putting such patients in the vehicles of their licensed operators. If the state's omission were not coupled with its personal hand in placing innocent third parties in harm's way, no legally identifiable "special relationship" could be identified to which liability may attach.
The facts presenting themselves here differ from the too typical everyday situation in which one falls victim in an auto accident to the uninsured driver who gets behind the wheel, notwithstanding previous notices (or even demands) from the state that his driving privileges have been revoked. While it may be argued that in such situations the state should have removed the driver from the road, the state is not liable because it does not place the victim in harm's way. Compare, e.g., Guillot v. Sandoz, 497 So.2d 753, 756 (La.App. 3 Cir.1986), writ denied, 501 So.2d 217 (La.1987) ("[T]here is nothing to prevent a driver who is under suspension from driving if he chooses to do so."), with Kendrick v. City of Lake Charles, 500 So.2d 866 (La.App. 1 Cir.1986) (cause of action exists against city for action of police department that arrested driver for DWI in permitting her, predictably to regain possession of vehicle only two hours later, while still intoxicated).
Our decision today leaves unaffected the pre-existing limitations upon attaching liability on public officials or offices:
"[T]he mere fact that a duty is of a public nature, and benefits the general public, does not require a conclusion that the city cannot be found liable for the breach of that duty." Stewart v. Schmieder, 386 So.2d 1351, 1358 (La.1980). The duties of members of a city police department relate to its governmental function of maintaining public order. Tezeno v. Maryland Casualty Co., 166 So.2d 351 (La. App. 3d Cir.1964). When a public official breaches a duty which is owed to the public in general, such breach of duty generally does not result in liability to an individual. However, where a personal or individual relationship (one-to-one relationship) arises between the police officer and an individual, liability may be imposed for breach of a duty owed by the police officer to the individual. Serpas v. Margiotta, 59 So.2d 492 (La.App.Orl.1952). A duty owed *610 to the public in general may be transformed into a duty owed to an individual through closeness in proximity or time. Once the personal or individual relationship has been established, the police officer then becomes obligated to conduct himself in such a way as not to cause the individual unnecessary injury. Tompkins v. Kenner Police Department, 402 So.2d 276 (La.App. 4th Cir.1981).
Kendrick, at 870.
Because here the state through its Department of Health and Human Resources knew Broadway Transportation had no insurance contrary to the state's own regulation, yet took affirmative steps to place plaintiff in a position of peril, I concur in the results fairly achieved by the majority.
NOTES
[1] See the state's "Provider Manual" [Plaintiff's Exhibit 7] for information contained in this section of the opinion regarding the Medical Assistance Program.
[2] Judge Brown, who wrote the majority opinion on rehearing dissented on the original hearing and used the expression "special relationship," 596 So.2d 1324, 1330, although he did not so qualify it in his majority opinion on rehearing.