# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 17-1131 consolidated with 17-1132

ALVIN PETE

VERSUS

STATE OF LOUISIANA, DEPARTMENT OF CORRECTIONS, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 81146
HONORABLE LORI ANN LANDRY, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and
D. Kent Savoie, Judges.

**AMENDED IN PART; AFFIRMED AS AMENDED.**

Charles Brandt
Brandt & Sherman, L.L.P.
111 Mercury Street
Lafayette, LA 70503
Telephone:  (337) 237-7171
COUNSEL FOR:
     Plaintiff/Appellee - Alvin Pete

Patrick B. McIntire
Oats & Marino
Gordon Square – Suite 400
100 East Vermilion Street
Lafayette, LA 70501
Telephone:  (337) 233-1100
COUNSEL FOR:
     Defendant/Appellant - Ronald Theriot, Sheriff

**THIBODEAUX, Chief Judge.**

Plaintiff, Alvin Pete, filed suit against Ronald J. Theriot, in his official capacity as the sheriff of St. Martin Parish (Sheriff), seeking damages for an injury he sustained to his left eye while incarcerated in the St. Martin Parish Jail, Breaux Bridge Substation 2 (jail). The trial court found in favor of Mr. Pete, awarding him $50,000.00 in general damages. Both parties appealed. In this opinion, we have consolidated the two appeals, 17-1131 and 17-1132. Reviewing the record, we find that the trial court erred in failing to apportion comparative fault and that the general damages award was abusively low. Accordingly, we amend the judgment to correct these errors and affirm the judgment as amended.

I.

**ISSUES**

The Sheriff entreats us to consider the following issues:

(1)     To the extent that the Judgment casts the Sheriff in liability for damages, the trial court erred by finding the Sheriff at fault for Plaintiff's injury, including through a failure to train, by allowing aggregate within the trustee yard, or by failure to supervise the trustees;

(2)     To the extent that the Judgment casts the Sheriff in liability for damages, the trial court erred in failing to apportion fault to the trustees who were throwing the rocks; and

(3)     The trial court erred in overruling the Sheriff's exception of prematurity for failure to exhaust administrative remedies, and in failing to reconsider that ruling at trial when it was clear that the Plaintiff's testimony had changed.

Mr. Pete asks this court to consider if the trial court committed error in awarding only $50,000.00 to Alvin Pete for loss of his eyesight in his left eye.

## II.

## FACTS AND PROCEDURAL HISTORY

On February 18, 2013, Mr. Pete was an inmate at the jail located in St. Martinville, Louisiana. While working in the trustee yard, Mr. Pete was struck in the left eye with a rock thrown by another inmate, Freddie Handy. After evaluation of his injuries at the jail's medical facility, Mr. Pete was transferred to University Medical Center in Lafayette, Louisiana, for treatment. Once there, it was determined that the injury required specialized treatment at the Louisiana State University Eye Clinic. On the evening of February 18, 2013, doctors performed an eight-hour surgery that resulted in Mr. Pete losing sight and use of his left eye. Mr. Pete returned to the jail and, after a short convalescence, he was transferred to Hunt Correctional Center (Hunt) to serve out the remainder of his sentence.

Mr. Pete filed his petition for damages against the Sheriff, among other defendants, on February 11, 2014.[1] Therein he alleged negligence on the part of the Sheriff, "in the following, non-exclusive particulars:"

1.   failure "to properly and adequately supervise the inmates . . . so as to avoid risk of injury encountered;"

2.   failure "to maintain the trustee yard . . . in a reasonably safe condition, including having dangerous instrumentalities present in the yard;"

3.   failure "to have in place adequate policies to protect the physical safety and welfare of inmates;"

---

[1]Mr. Pete initially named as defendants the State of Louisiana through the Department of Public Safety and Corrections and the St. Martin Parish Sheriff's Office. He subsequently amended his petition to name, as the proper party defendant, the Sheriff in his official capacity. The State was later dismissed on an unopposed peremptory exception of no cause of action.

4.  failure "to adequately enforce policies and procedures designed to protect the physical safety and welfare of inmates; and"

5.  failure "to have sufficient personnel on hand to properly and adequately supervise the inmates while in the trustee yard."

In response, the Sheriff filed a dilatory exception of prematurity, alleging that Mr. Pete's claims were premature because he had not exhausted the available administrative remedies as required by the Prison Litigation Reform Act, La.R.S. 15:1181-1191. Mr. Pete opposed the exception, arguing that any failure to use the administrative remedy available was due to the Sheriff's failure to comply with his office's policy.

The testimony at the hearing on the exception revealed that Mr. Pete was booked into the jail on May 1, 2012, at which time he received a copy of the St. Martin Parish Correctional Center Inmate Handbook (handbook). The handbook contained the policies and administrative remedy procedures (ARP) at issue herein. Specifically, the handbook allowed thirty days in which to file an ARP request, unless time was extended by "extenuating circumstances." While suggesting a particular form for filing grievances, the handbook did not include an ARP request form. Major Robley Picard, who served as the jail's warden at the time of Mr. Pete's injury, testified that the appropriate forms were available "on a desktop in the conference room" to which the trustees had access, but were not in an identifiable area.

Upon completion of an ARP request, the policy allowed for any employee on duty to accept the form, thus beginning the process for a complaint. The employee receiving the ARP request was then required to deliver the form to

3

the warden's inbox, after which the warden had fifteen days to respond. Major Picard further testified that there existed no policy "where whomever received [the request] was responsible for documenting it anywhere like [in] a log book." He also did not have a log to document receipt of requests; rather, he would just answer the request and put it in the inmate's file.

Mr. Pete testified that he was aware of the ARP, which he followed. He further testified that after asking for an ARP request form and being told those forms were not available, he submitted a handwritten request approximately four days after his release from the hospital. Mr. Pete further explained that he wrote multiple copies of his request because he did not have access to a copy machine. He gave the original to Deputy Ernest Singleton, kept a copy for himself, and sent the other copies to attorneys in an effort to obtain representation. Major Picard testified, however, that, while he was familiar with Deputy Singleton who was employed during this period and was capable of accepting requests, he himself did not receive Mr. Pete's original ARP request. Deputy Singleton was not called to testify.

After taking the matter under advisement, the trial court denied the exception finding that the Sheriff presented no evidence to refute Mr. Pete's assertion that he followed the ARP set forth in the handbook. The trial court reasoned:

> Simply because the Warden did not receive Mr. Pete's grievance, does not prove that Plaintiff did not file the grievance. Additionally, the court found Plaintiff's testimony credible and corroborated by testimony concerning "Sergeant Singleton" by Plaintiff and the Warden. Notwithstanding the written policy which Plaintiff admits he received, the policy provides no method of tracking receipt of complaint, or response to a complaint. Although the jail utilized an employee

4

grievance form during their investigation of the incident, even it was not signed by the Plaintiff. As a result of the above, the mover could not carry the burden of his exception of prematurity and thus his Dilatory Exception of Prematurity is **DENIED**.

At the bench trial on the merits, the unrefuted testimony established that on the morning of February 18, 2013, Mr. Pete's left eye was struck by a limestone rock thrown by Mr. Handy, while Mr. Pete was walking on a pathway in the trustee yard. The aerial view exhibits admitted into evidence depicted the trustee yard as a general area of approximately one acre that housed the trustees, which included three dormitories and a conference center used by the administration. The pathway where the incident occurred was an open space between the conference center and the dormitories that was covered with limestone aggregate.

In his case-in-chief, Mr. Pete first called Major Picard, who testified to the duties of guards to care for, keep control of, maintain custody of, monitor, and escort the inmates. He agreed that "correctional officers have an obligation to watch the prisoners to prevent them from harming other prisoners[.]" On the day of the accident, Major Picard explained that two guards—Deputy Singleton and Deputy Matthew Newton—were supposed to be monitoring and controlling the trustees, but only Deputy Newton was present. He admitted there was "no record whatsoever of Deputy -- or Sergeant Singleton being there that day." Regarding the supervision of the inmates, Major Picard agreed that the general rule was that "trustees are always monitored and supervised," the exception being when a deputy "had to leave because of some incident somewhere else[.]" He conceded that, although it did not specifically cross his mind that someone might use one of the limestone rocks as a weapon, it was "a possibility because there's a lot of

5

things that can be used as a weapon." And while it was impossible to remove everything, Major Picard stated that it was not impossible to remove the limestone that covered fifty percent of the one-acre trustee area.

On cross-examination, Major Picard testified that he was never required by the Department of Corrections to remove the limestone aggregate and never cited by the department for having aggregate in the trustee yard. Moreover, he explained that there were no prior rock throwing incidents with injury.

In his testimony, Deputy Newton recalled that, on the day of the accident, he was the only deputy on duty in the trustee yard. Because a trustee needed a tool, Deputy Newton had gone into one of the dormitories to unlock the cage where the tools were kept. On his way back from the dormitory, he saw inmate Allen Perro throw something, which turned out to be a rock, at Mr. Handy. Deputy Newton then witnessed Mr. Handy grab a rock and throw it at Mr. Perro; the rock hit Mr. Pete instead. Immediately thereafter, the deputy saw Mr. Pete bend over, grabbing his left eye, while Mr. Handy removed his shirt and applied pressure to the wound. Mr. Handy then assisted Mr. Pete to the medical facility. Meanwhile, Deputy Newton left to conduct a random drug screen on other trustees. When questioned regarding his reaction, or lack thereof, to the incident, Deputy Newton testified that he did nothing because he was too far away for them to hear him and he did not believe they would have had time to stop. He approximated that he was 150 feet from the men at that time, but he would "assume" that the men would not have been throwing rocks if he had been standing closer to them.

The witness statements and deposition testimony of Mr. Handy corroborated Deputy Newton's recollection of the events of that morning. They further clarified that at least two rocks were thrown: one thrown by Mr. Perro,

which hit Mr. Handy, and the other one thrown by Mr. Handy, which hit Mr. Pete. Mr. Handy testified, in his deposition, that he had seen other inmates throwing rocks.

Mr. Pete then testified regarding his lengthy surgery in which his eyeball was "stitched . . . up." He also explained the effects, both mental and physical, of his injury and disfigurement as his eyeball has "sunk back" and is now "flat." As he stated, his left eyelids do not open as there is "no pressure to push [the top] eyelid up." And according to his testimony, he now has weakness in his right eye due to the loss of his left eye. As to how he feels, Mr. Pete testified that it is "very hard." He cannot get a job as no one wants to hire him because he poses a risk, and he cannot function as he used to because he now has a permanent blind spot on his left. When he looks in the mirror, he feels "bad" about himself and is embarrassed.

On cross-examination, Mr. Pete testified that he had seen inmates tossing rocks before. When questioned regarding the filing of his ARP request, Mr. Pete again testified that he knew he had to file a grievance, which he did by hand. In an attempt to clarify why some copies of his ARP request referred to events that occurred weeks after the accident, Mr. Pete explained that he wrote another request after his transfer to Hunt because he had not received anything from the warden in response to his initial request.

Mr. Pete then called his expert in "[m]anagement of correction facilities" and "[s]ecurity at correction facilities," Terry Hines. Mr. Hines opined that rocks "should not have been on that part of the recreation yards where any offender could have gotten a hold of." Further, he had never been in a facility where the recreation yard for prisoners had limestone or rocks that were not

7

covered with cement or sod. In his opinion, failure to remove a known hazard would fall below the standard of care, and if it was in the administrators' minds that the limestone might have been used as a weapon, then they needed to do something to address it. He further opined that an officer not at his post is below the standard of care, particularly in this case where an "officer's presence would have been enough to keep those individuals from throwing the rocks because they knew he was in the area and they would get disciplinary write-ups."

When questioned regarding Deputy Newton's reaction, Mr. Hines testified that Deputy Newton should have either "yelled something to immediately shut down the rock throwing incident" or "call[ed] for assistance so he could have got [sic] staff there quicker to stop the horseplay." He clarified, however, that in Deputy Newton's defense

> it could have happened so quick that they picked up the rock that it wouldn't have mattered if he had yelled or not. That's why it's important that he should have been in the area supervising. There may have only been three inmates. But if that was his assigned area, then he should have been in that area, not checking out tools.

On cross-examination, Mr. Hines did concede that he could point to no applicable standard where "having aggregate on a trustee yard [wa]s a violation." But he explained that

> common sense would dictate that when you're running a prison, things are going to happen, and if we as administrators don't negate that like removing aggregate, people are going to throw rocks. Offenders are going to throw rocks. Offenders are going to get hurt. Staff could get hurt. My biggest concern isn't so much for the offender as it is staff. If they had a riot at that facility, the first thing the offenders are going to do is go to that rock to throw at staff, guaranteed. If there was a disturbance, that would happen.

When questioned further, Mr. Hines agreed that no inspection report ever "wrote them up" for the aggregate, the general guidelines do not require constant supervision of trustees, and his opinion was based on the trustees being in the yard to recreate. Admittedly, he "would not expect every trustee to have a deputy with eyes on him at all times."

Mr. Pete then rested his case, and the Sheriff began presenting his defense by calling his "expert in jail standards, operations, inspections, policies, and procedures, including design considerations," Gary Walter DeLand. Mr. DeLand opined that having aggregate in the trustee yard was not below the standard of care in this case. While he agreed that jails should remove things that have no specific value, he opined that the aggregate had a purpose in this case and did not violate any standard for the design or operation of a jail such as the one herein. He further found no violation of staffing standards or substandard conduct by the jail staff. And he had "no quarrel" with doing fifteen to thirty minute checks on the trustees in the various trustee areas, explaining

> it would be inordinately expensive to have one officer being able to see every individual at every time. Certainly, in the system I ran, that was never the case, and I see systems all over the country. Depending on the design of the facility and the layout, many of them go straight from housing into recreation when they're not actually working and there's nobody to follow them back and forth between that process. When they're actually working and they've got tools in their hands and so on, then there's generally somebody who's more able to watch. But I also see all over people mowing lawns, working in gardens, other kinds of things with staff members only making periodic checks on them. So, again, there's a limit to how much you can do financially with staffing. You can't have one staff for every inmate or one staff for every single spot where anything could conceivably go wrong.

In DeLand's opinion, it was well within the scope of Deputy Newton's responsibilities that, if a trustee needed a tool, he would get it, and "there is no requirement that somebody be standing in the middle of the yard at all times waiting for the trustees to do something wrong while they're in recreation." But on cross-examination, he admitted that he could not name one prison that he "participated in designing where [he] recommended the use of limestone aggregate that would be available to an inmate" because "[y]ou don't recommend that they have anything like that in place."

The Sheriff then recalled Deputy Newton, who was questioned regarding his training as a correctional officer. Deputy Newton described his training, beyond police officer standardized training, as follows: "We go to in-services. It would consist of different report writing, handcuffing techniques, very minimal law, and just other miscellaneous." He further testified that he had never before witnessed rock throwing like the incident in this case, but agreed that the use of possible weapons is deterred by officer presence. He was not, however, required to be on the trustee yard at all times, and he and the other deputy working the trustee area would rotate rounds.

At the conclusion of testimony, the Sheriff proffered Major Picard's testimony about the ARP from the 2014 exception hearing, having reurged his exception of prematurity. The trial court noted that Deputy Singleton, while deceased at the time of trial, was not deceased at the time of the hearing in 2014, but the Sheriff had failed to call him to testify at that time.

Again taking the matter under advisement, the trial court found in favor of Mr. Pete, awarding $50,000.00 in general damages as follows: $10,000.00 for past, present, and future physical pain and suffering; $5,000.00 for

past, present, and future mental pain and suffering; $10,000.00 for loss of enjoyment of life; and $25,000.00 for permanent disability. The trial court then assessed costs to the Sheriff.

In its written reasons, the trial court found that it was more probable than not that Deputy Singleton was not at his post that day, leaving Deputy Newton alone with the three trustees in the presence of rocks, which both experts agreed created an additional risk of danger in prison populations. Moreover, the court found Deputy Newton's lack of training was evident in his actions immediately before, during, and after the incident and highlighted the court's "concern regarding unattended trustees and the danger it involves." The court then concluded that the facts clearly established that

> it was commonplace for trustees to be unsupervised and move freely about the facility. What is also clear, is that the defendant's failure to adequately train and supervise created an environment that a reasonably prudent man should have assumed would result in throwing the readily available aggregate. This Court finds that an ordinarily prudent person should have reasonably foreseen that his conduct would cause injury as that suffered by Mr. Pete. The defendant's failure to do so, falls below the standard of care for anyone housing or detaining prisoners.

As to its award of damages, the trial court found that "given the right employer and circumstances, Mr. Pete could still perform janitorial work." Though acknowledging Mr. Pete's failure to present any psychological or medical evidence, the trial court recited his testimony regarding the weakening of his right eye due to overcompensation, his intermittent sadness because of his appearance, the pain associated with the injury, and his residual pain. That testimony, coupled with his permanent and obvious disfigurement that will only worsen as the eye

11

continues to sink, led the court to conclude that an award of $50,000.00 was sufficient compensation for Mr. Pete's damages.

## III.

## STANDARD OF REVIEW

An appellate court reviews the factual determinations of the trier of fact under the manifest error-clearly wrong standard of review. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The manifest error standard also applies when reviewing judgments on dilatory exceptions of prematurity. *Barlow v. Garber*, 17-401 (La.App. 3 Cir. 11/2/17), 230 So.3d 1002. Quantum awards, however, are subject to an abuse of discretion standard. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

## IV.

## LAW AND DISCUSSION

As previously recited, both the Sheriff and Mr. Pete have appealed to this court, raising several issues. Taking these issues in procedural order, we look first to the issue of whether the trial court erred in denying the Sheriff's exception of prematurity.

### *Prematurity*

Louisiana Code of Civil Procedure Article 926(A)(1) provides for the dilatory exception raising the objection of prematurity when the applicable law has provided a procedure for a claimant to seek administrative relief before resorting to judicial action. *Barlow*, 230 So.3d 1002. In an exception of prematurity, the exceptor bears the initial burden of showing that an administrative remedy or

12

procedure applies and "that the plaintiff failed to submit his claim for review before the administrative tribunal prior to filing suit." *Mosley v. La. Dep't of Pub. Safety & Corrs.*, 07-1501, p. 2 (La.App. 3 Cir. 4/2/08), 980 So.2d 836, 837. Once the existence of an administrative remedy is established, "the burden shifts to the plaintiff to prove that he has exhausted his administrative remedies or that the administrative remedies available to him are irreparably inadequate." *Id.*

Pursuant to La.R.S. 15:1184(A)(2), "[n]o prisoner suit shall assert a claim under state law until such administrative remedies as are available are exhausted. If a prisoner suit is filed in contravention of this Paragraph, the court shall dismiss the suit without prejudice." Louisiana Revised Statute 15:1184(A)(1) defines "administrative remedies" as

> written policies adopted by governmental entities responsible for the operation of prisons which establish an internal procedure for receiving, addressing, and resolving claims by prisoners with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison.

Significantly, however, if the governmental entity does not follow its own procedural requirements, any questions regarding the completion of its process is strictly construed against the entity as its failure cannot and should not enure to its own benefit. *Wallace v. GEO Grp., Inc.*, 11-863 (La.App. 3 Cir. 2/1/12), 84 So.3d 750.

As established by the evidence, the jail adopted a policy for the administrative resolution of inmate claims, including the present claim for damages. The policy, as set forth in the handbook, required the inmate to submit his ARP request to the warden within thirty days of the incident. Testimony established that an ARP request could be submitted to a deputy, who, in turn, was

required to then deliver the form to the warden's inbox. There was, however, no policy for logging receipt or delivery of the request.

The parties do not dispute the existence of the ARP or of Mr. Pete's knowledge of the ARP as well as his need to follow it. Rather, the question is whether Mr. Pete actually filed an ARP request in the first place. On this point, the testimony seemingly conflicts with Mr. Pete stating that he gave his handwritten request to Deputy Singleton four days after the incident and the Sheriff claiming no such request was ever delivered to the warden. In support of his position, Mr. Pete submitted several copies of his handwritten request, which he made because he did not have access to a copy machine. The Sheriff submitted Mr. Pete's inmate file, which did not contain a copy of the request, but his witness admitted that Deputy Singleton was capable of accepting ARP requests. Given the lack of a logging protocol as well as the absence of Deputy Singleton's testimony, there is no definitive way in which to determine whether Mr. Pete filed his request with the deputy. What this ultimately came down to was a credibility call, which the trial court made in Mr. Pete's favor.

As has been long established,

> [w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of

14

> one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell*, 549 So.2d at 844-45 (citations omitted). To establish manifest error, the Sheriff relies heavily upon the discrepancies in (1) the various handwritten copies of the ARP request submitted into evidence, particularly in their references to events that transpired weeks after the incident, and (2) Mr. Pete's testimony as to when he filed the various copies. However, the copies and Mr. Pete's testimony, though somewhat confusing, are not so internally inconsistent that a reasonable factfinder would not credit his story, particularly given the fact that the copies were admittedly handwritten over a period of weeks for the purpose of following up on the original grievance as well as to solicit legal representation.

Based on the record evidence, we find it was reasonable for the trial court to find that the Sheriff did not carry his burden of proof, given his failure to introduce any evidence or testimony that could refute Mr. Pete's assertion that he filed a request pursuant to the ARP. As the trial court stated, just because the warden did not receive the request does not prove Mr. Pete did not file a request. Moreover, because any failure in the administration of the ARP must accrue to benefit of the inmate, we find no error in the trial court's denial of the Sheriff's exception of prematurity.

### *Liability*

Moving now to the issue of liability, the Sheriff argues that the trial court erred in finding him at fault. In its argument, the Sheriff focuses upon the trial court's reasons in which it found the Sheriff liable on the basis of his failure to train the deputies, the presence of the limestone aggregate in the trustee yard, and the deputies' failure to supervise the trustees.

In *State ex rel. Jackson v. Phelps*, 672 So.2d at 666-67, our supreme court set forth the duty-risk analysis applicable in negligence cases like this one:

> In order to determine whether liability exists under the facts of a particular case, our court has adopted a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. *Mundy v. Department of Health and Human Resources*, 620 So.2d 811, 813 (La.1993). While a penal institution is not an insurer of an inmate against attacks by other inmates, penal authorities have a duty to use reasonable care in preventing harm after they have reasonable cause to anticipate it. *Breaux v. State*, 326 So.2d 481, 482 (La.1976); *Parker v. State*, 282 So.2d 483, 487 (La.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). Whether the state breached its duty will depend on the facts and circumstances of each case. *Manasco v. Poplus*, 530 So.2d 548 (La.1988). Thus, we must determine whether the penal authorities at DCI had reasonable cause to anticipate harm to plaintiff and, if so, whether they failed to use reasonable care in preventing such harm.

The issue before this court, therefore, is whether, based on the record evidence, the Sheriff had reasonable cause to anticipate an inmate could be harmed by the throwing of limestone aggregate and, if so, whether the Sheriff failed to use reasonable care in preventing this harm. Based upon its judgment, the trial court clearly found the Sheriff had reasonable cause to anticipate the injury and failed to take reasonable steps to prevent it.

In order to reverse the trial court's factual findings, this court would have to satisfy a two-part test: (1) we would have to find from the record that no reasonable factual basis exists for the finding of negligence; and (2) we would then have to find that based on the entire record the finding was clearly wrong. *Stobart*

16

*v. State through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). However, neither part of the test can be satisfied based on the record before us.

As to whether the Sheriff had reasonable cause to anticipate the injury, both experts agreed that, while the presence of limestone aggregate in the trustee yard was not negligence per se in that it did not violate any explicit standard, the presence of rocks did create an additional risk of danger for both the trustees and the guards. The Sheriff's expert even testified that he would not have and never did recommend the placement of aggregate in a prison yard. Although anything could be fashioned into a weapon with enough ingenuity, the experts as well as the warden and Deputy Newton all conceded that a rock, specifically the limestone aggregate, could be used as a weapon. Moreover, the testimony at trial revealed that rocks had been thrown or tossed before by trustees. The fact that no other previous incident of rock throwing resulted in injury does not negate the foreseeability of the present injury. Therefore, it is reasonable to conclude the Sheriff either knew or should have known that a rock could be thrown and result in injury to a trustee or a guard.

Expert testimony at trial further established that the Sheriff had a duty to remove known hazards or to supervise the trustees in the presence of these hazards, as both experts agreed a deputy's presence was enough of a deterrent. The record evidence does reasonably demonstrate a lack of supervision in this case.

The testimony clearly established that two guards were supposed to be on duty; however, the presence of one guard, Deputy Singleton, was never proven, leaving only Deputy Newton to supervise the trustees in the yard. In his testimony, Deputy Newton explained how he saw the whole incident but did nothing (1) when

17

Mr. Perro first threw a rock at Mr. Handy, (2) when Mr. Handy next picked up a rock in retaliation, and (3) when Mr. Handy then threw the rock at Mr. Perro, hitting Mr. Pete. Mr. Pete's expert opined that Deputy Newton's failure to yell out or call for help was below the standard of care as was Deputy Singleton's failure to be at his post. This evidence more than adequately supports the trial court's finding that the Sheriff, on that day, through his deputies inaction and lack of supervision, failed to take the steps necessary to prevent the reasonably foreseeable injury. Therefore, we cannot find the trial court's finding of liability on the part of the Sheriff was manifestly erroneous based on this record. We do, however, find that the trial court erred in failing to apportion comparative fault.

***Comparative Fault***

Louisiana Civil Code Article 2323(A) provides, in pertinent part:

In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.

In *Thompson v. Winn-Dixie Montgomery, Inc.*, 15-477, p. 14 (La. 10/14/15), 181 So.3d 656, 666-67, the supreme court recited the well-established factors a court considers in evaluating fault:

(1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and, (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.

18

A trial court's factual findings regarding percentages of fault cannot be reversed absent clear error. *Purvis v. Grant Par. Sch. Bd.*, 13-1424 (La. 2/14/14), 144 So.3d 922. We find, however, such error is present on this record in the trial court's failure to apportion any fault, particularly given Mr. Handy's uncontested admission that he threw the rock that injured Mr. Pete. Having found clear error, we are now charged with apportioning fault, but only to "the highest or lowest point respectively which is reasonably within the trier of fact's discretion." *Brewer v. J.B. Hunt Transp., Inc.*, 09-1408, p. 21 (La. 3/16/10), 35 So.3d 230, 244.

After reviewing the record in light of the factors recited above, we observe that the Sheriff was arguably in a superior position to prevent the injury in this case. While Mr. Handy's action was a contributing factor, the injuries here would not have occurred (1) if the limestone aggregate had not been present in the trustee yard, and (2) if reasonable supervision would have been provided by the deputies, one of whose presence could not be established and the other who admittedly failed to take any action after witnessing Mr. Perro cast the first stone. In short, had the rocks not been available to the trustees and had the Sheriff provided the supervision reasonably necessitated by the presence of the rocks, Mr. Pete would not have lost his left eye. Thus, we conclude that the record dictates that the Sheriff must bear the greater percentage of fault. Accordingly, we apportion 80% fault to the Sheriff and 20% fault to Mr. Handy, amounts that we find are the highest and lowest amounts the trial court could have reasonably allocated to them.

*Quantum*

In his sole assignment of error, Mr. Pete argues that the trial court abused its vast discretion in awarding only $50,000.00 in general damages for the loss of his left eye. Based upon the evidence of record, we agree.

Because general damages are inherently speculative in nature and cannot be fixed with mathematical certainty, the law grants the factfinder much discretion in their assessment. *Youn v. Mar. Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). Our role, as the reviewing court, is not to decide what we may consider to be an appropriate award, but rather to determine "whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it." *Id.*; *Bitoun v. Landry*, 302 So.2d 278, 279 (La.1974). The adequacy of the award must be determined by the facts or circumstances particular to the case under consideration. *Youn*, 623 So.2d 1257. Only after finding an abuse of that broad discretion, based on the record, can we "disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court." *Coco*, 341 So.2d at 335.

While we recognize the uncertainty and honest disagreements that arise in evaluating and assessing issues of quantum, the facts and evidence of this case do not reasonably support the trial court's award, which we find is so low in relation to Mr. Pete's injury and permanent disfigurement that it shocks the conscience. Although there was no medical evidence, Mr. Pete's inmate file, his visual exhibits, and his testimony all document the loss of his left eye and the extensive surgery he had to endure, as well as the pain and suffering associated with both. The physical effects of his impairment, such as the weakness of his

right eye from overcompensation and the permanent blind spot to his left, were also established through his testimony. His disfigurement resulting from the continued "sinking" of his left eye was clearly shown through the photographic evidence and observations of his person, while the sadness and embarrassment arising therefrom were clearly evident in Mr. Pete's testimony.

In all the cases submitted by the parties, the award of general damages for loss of eyesight in one eye exceeded $50,000.00, when inflation is taken into consideration.[2] *See Hall v. Nix*, 10-1146 (La.App. 4 Cir. 2/23/11), 60 So.3d 61 ($400,000.00 for injury to optic nerve, glaucoma, and vision loss in one eye resulting from medical malpractice); *McPherson v. Lake Area Med. Ctr.*, 99-1876 (La.App. 3 Cir. 5/24/00), 767 So.2d 102, *writ denied*, 00-1928 (La. 9/29/00), 770 So.2d 353 ($275,000.00 for left retinal arterial occlusion and permanent loss of vision resulting from medical malpractice); *Berry v. State through Dep't of Health & Human Res.*, 625 So.2d 600 (La.App. 3 Cir. 1993), *rev'd on other grounds*, 637 So.2d 412 (La.1994) ($70,000.00 for broken wrist, laceration on forehead, and injury to and decreased vision in one eye arising from automobile accident); *Varnado v. Sanders*, 477 So.2d 1205 (La.App. 1 Cir. 1985), *writs denied*, 481 So.2d 630 (La.1986) ($150,000.00 for corneal laceration, loss of iris and lens, and loss of vision in one eye resulting from contact with barbed wire); *Outlaw v. Bituminous Ins. Co.*, 357 So.2d 1350 (La.App. 4 Cir.), *writ denied*, 359 So.2d 1293 (La.1978) ($150,000.00 for loss of eyesight in one eye when struck with a golf ball); *Fairchild v. Brian*, 354 So.2d 675 (La.App. 1 Cir. 1977), *writ denied*, 356

---

[2]Both parties quoted current values for the awards. Any reference to current valuation made herein is based on calculations from the Consumer Price Index Inflation Calculator, rounded down to the nearest ten thousand, when utilizing as our base the month and year of the appellate decisions and March 2018. CPI INFLATION CALCULATOR, http://www.bls.gov (last visited April 13, 2018).

So.2d 437 (La.1978) ($25,000.00 for loss of vision caused by delay in discovering detached retina); *Borne v. Bourg*, 327 So.2d 607 (La.App. 4 Cir. 1976) ($30,000.00 for blindness in one eye resulting from being poked with finger); *Walker v. Champion*, 288 So.2d 44 (La.1973) ($100,000.00 loss of an eye resulting from hit with a beer bottle).

Not only has Mr. Pete lost his eyesight in his left eye, he has essentially lost the eye itself as the continued lack of pressure allows the eye to sink further into the socket, resulting in permanent disfigurement. The only case with a similar extensive loss of the eyeball itself was *Walker*, wherein the plaintiff was outfitted with a prosthetic eye, which would have prevented the sinking Mr. Pete now suffers, and the award in *Walker* would value over $570,000.00 today. Although *Fairchild* and *Borne* awarded damages below $50,000.00, the value of these awards would be around $100,000.00 and $130,000.00 in today's currency, respectively, and neither injury was as extensive or as disfiguring as Mr. Pete's injury.

Comparing the facts of this case and Mr. Pete's specific injuries with this jurisprudence, we find the sum of $150,000.00 to be the lowest amount of general damages the trial court could have reasonably awarded Mr. Pete. We, therefore, amend the judgment to increase Mr. Pete's general damage award from $50,000.00 to $150,000.00.

V.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is amended to apportion 80% fault to the Sheriff and 20% fault to Mr. Handy and to increase

22

the general damage award from $50,000.00 to $150,000.00.  As amended, the judgment is affirmed.

Costs of this appeal are assessed to Sheriff Ronald J. Theriot.

**AMENDED IN PART; AFFIRMED AS AMENDED.**