DIANNE JACKSON

VERSUS

UNDERWRITERS AT LLOYD'S OF LONDON,
VIC 3 ENTERPRISES, LLC, AND
NAPOLEON WHITE

NO. 21-CA-15

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 71,668, DIVISION "C"
HONORABLE J. STERLING SNOWDY, JUDGE PRESIDING

September 29, 2021

**JOHN J. LEE, JR.**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Robert A. Chaisson, and John J. Lee, Jr.

**AFFIRMED**
 **JJL**
 **MEJ**
 **RAC**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy Clerk, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
DIANNE JACKSON
    Matthew D. Hemmer

COUNSEL FOR DEFENDANT/APPELLANT,
UNITED SPECIALTY INSURANCE COMPANY, VIC 3 ENTERPRISES, LLC
AND NAPOLEON WHITE
    George O. Luce
    Frederic C. Fondren

**LEE, J.**

Defendants, United Specialty Insurance Company, Vic 3 Enterprises, LLC, and Napoleon White, appeal the jury's verdict in favor of plaintiff, Dianne Jackson. On appeal, defendants seek a reduction in the amount of damages awarded for future medical expenses, and plaintiff seeks an increase in the amount of damages awarded for future pain and suffering. Defendants also challenge the admissibility of certain evidence. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case arises from a motor vehicle accident that occurred on January 20, 2017. In her Petition for Damages, plaintiff, Dianne Jackson, asserts that at approximately 6:00 a.m., she was operating her vehicle, a Nissan Altima, in an easterly direction on La. Highway 44 in St. John the Baptist Parish when a Mack dump truck owned by Vic 3 Enterprises, LLC (Vic 3) and operated by one of Vic 3's employees, Napoleon White, struck the rear of plaintiff's vehicle, causing personal injuries and property damage to Ms. Jackson. The petition names three defendants: Vic 3; Napoleon White; and United Specialty Insurance Company, as the liability insurer of Vic 3 and Mr. White.

Trial of this matter was held August 26 – 29, 2019. Thirteen witnesses testified: Ms. Jackson, Lieutenant Elton Foret, Dr. Randall Poche, Dr. Robert Dale, Dr. Firas Hijazi, Dr. Mohammad Almubaslat, Dr. Aaron Wolfson, Dr. Shael Wolfson, Bridgette Stewart, Vincent Davis, Pat Armour, Dr. Gabriel Tender, and Stacie Nunez. In addition, the video of the collision; photographs of the plaintiff and Vic 3's vehicles; the police report; medical records and bills; and the life care plans of Dr. Aaron Wolfson and Ms. Nunez, among other things, were admitted into evidence.

At trial, the trial court read defendants' admission to the jury as follows: "A motor vehicle accident occurred on January 20th of 2017 where Dianne Jackson

was rear-ended by a 2015 Mack truck operated by Napoleon White during the course and scope of his employment with Vic 3 Enterprises, LLC. Napoleon White was the sole cause of the incident, and liability is not contested. Dianne Jackson sustained injuries as a result of the incident. This is an admission on the part of Vic 3 Enterprises, Napoleon White and United Specialty Insurance Company."

Ms. Jackson testified that on January 20, 2017, she was on her way to work when someone "slammed" into the back of her vehicle while she was stopped at a red light. She explained that it was dark and that the impact pushed her vehicle to the side of the roadway. Ms. Jackson stated that it was a "hard" impact that caused her to "jerk" so hard that it hurt her neck. She noted that the sound was so loud that she thought her vehicle was going to "explode." Ms. Jackson asserted that she was in a lot of pain following the accident. She testified that after the accident, a man came over to her to see if she was okay. She recalled that she leaned on him and told him that she was "dizzy," like she was going to "pass out." Ms. Jackson further testified that when she told the man he had hit her, the man replied that he did not hit her and that a man in a big dump truck had hit her and kept going.

Lieutenant Foret of the St. John Parish Sheriff's Office testified that on January 23, 2017, he obtained video of the accident from a crime camera located at LA 44 and Central Avenue in Reserve where the accident occurred, took a still shot of the dump truck to that location, and learned that the dump truck looked like one of Chester Victor's trucks. He contacted Mr. Victor, who told him that the dump truck was his and that the driver, Mr. White, worked for him.[1] Lieutenant Foret recalled that after viewing the accident on the video, Mr. White admitted to

_____

[1] Mr. White did not testify at trial.

2

being involved in the accident. He indicated that Mr. White did not know he had struck plaintiff's vehicle until he saw the video. He noted that Mr. White had a limp when he came to the police station and that Mr. White also walked with a limp on the video. Lieutenant Foret explained that Mr. White did not give him any reason as to why he left the scene but noted that Mr. White was concerned about losing his job. He testified that he cited Mr. White for hit and run and for careless operation of a motor vehicle. Lieutenant Foret asserted that the hit and run charge was later nolle prossed, that the other charge was reduced to defective equipment, and that Mr. White paid the ticket.

At trial, the video of the accident was played for the jury. Lieutenant Foret explained that the video showed the dump truck approaching the red light, but he could not tell if it came to a complete stop due to the poor lighting conditions. He further explained that after the light turned green, he could see plaintiff's vehicle "shake" and then move to the side of the roadway as it was being impacted by the dump truck. Lieutenant Foret pointed out that the video subsequently showed the dump truck pulling into the Valero gas station across the street, Mr. White walking across the street to plaintiff's vehicle, and then walking back to the dump truck, after which he left the scene.[2] He testified that in the police report, Deputy Batiste indicated that she was "flagged down" after the accident. Lieutenant Foret was unsure if Mr. White called the sheriff's office, and Deputy Batiste responded, or if Deputy Batiste was at the Valero gas station. Lieutenant Foret stated that he could not confirm if Mr. White was the individual who "flagged down" Deputy Batiste because it was not shown on the video, and Deputy Batiste was no longer employed with the sheriff's office.

---

[2] The video also shows that after Mr. White walked back to the Valero gas station, he walked out of the view of the camera for a period of time, after which he got into his truck and left.

3

Lieutenant Foret explained that even though it was a "low-speed crash," given the size and height of the dump truck, it was possible for plaintiff's trunk to be crushed as depicted in the photographs. Defense counsel moved the police report and narrative supplement into evidence, and plaintiff's counsel moved the video and the photographs of the vehicles into evidence.

Dr. Poche, plaintiff's primary care physician and an expert in the field of family medicine, testified that his records for plaintiff began on June 12, 2006, and that he had been plaintiff's doctor for at least the past thirteen years. He stated that he was aware that she had been in an accident on January 20, 2017, and noted that he had not treated her for chronic neck or back problems before the accident. Dr. Poche testified that the back and neck complaints that plaintiff had before the accident were muscular strain. He said that she had back or neck complaints in September of 2008, April of 2010, June of 2013, and September of 2015. Dr. Poche testified that plaintiff's first visit after the January 20, 2017 accident was on February 23, 2017, wherein she complained of chest wall pain, and he prescribed anti-inflammatory medication for her. He noted that plaintiff went to St. James Hospital emergency room after the January 20, 2017 accident.

Dr. Dale, plaintiff's chiropractor, testified that plaintiff first came to his office on January 27, 2017, because of pain following a motor vehicle accident on January 20, 2017. He asserted that during her first visit, plaintiff complained of pain in both shoulders, both sides of her neck and upper back, her low back, her left leg, and her right and left arms. He stated that plaintiff also complained of intermittent numbness in both hands. Dr. Dale testified that he performed an examination and obtained x-rays. He explained that plaintiff had degenerative joint and disc disease that was present before the accident, which made her more susceptible to injury. Dr. Dale testified that it was more likely than not that her symptomology was caused by the January 20, 2017 accident and that he was able

4

to give that opinion to a reasonable degree of chiropractic certainty. He stated that he treated her fifty-six times over six months, from January 27, 2017 to June 19, 2017, after which he referred her to a neurosurgeon.

Dr. Dale requested MRIs of plaintiff's cervical spine, thoracic spine, lumbar spine, and left knee which were done on March 29, 2017. The MRI report of the cervical spine indicated that plaintiff had central and right lateral disc herniation, cord compression and bilateral foraminal stenosis at C3-4; central and right lateral spondylosis, cord compression, and bilateral foraminal stenosis at C4-5; minor central spondylosis and advanced bilateral foraminal stenosis at C5-6; and a large right lateral disc herniation, right cord compression, and bilateral foraminal stenosis at C7-T1.

Dr. Hijazi, plaintiff's pain management physician, was accepted as an expert in the fields of anesthesia and interventional pain management. He testified that plaintiff came to see him on April 25, 2017, complaining of back and neck pain but mainly neck pain radiating into the shoulder blades. Dr. Hijazi further testified that he reviewed the neck MRI, which he said showed three herniations in her cervical spine, mainly at C3-4. He asserted that those cervical MRI findings were consistent with her symptoms. He stated that he performed an examination wherein he found muscle spasms in her neck and limited range of motion in her neck and shoulders. Dr. Hijazi testified that he gave plaintiff a shoulder injection during her first visit, but it provided limited relief, which told him it was not a shoulder issue. Dr. Hijazi further testified that on June 9, 2017, he gave her a cervical epidural steroid injection, which gave her excellent relief for the radiating pain down her left arm; however, the pain gradually returned, which told him that the symptoms were coming from the disc. He thought plaintiff might benefit from surgery, so he referred her to Dr. Almubaslat for a neurological consult.

5

Dr. Hijazi testified that on July 20, 2017, he gave her a facet block injection, which provided good relief. He stated that in July of 2017, he started plaintiff on Norco, a narcotic pain medication, and Duexis, an expensive anti-inflammatory medication containing ibuprofen and an antacid, but he had concerns of addiction issues with respect to the narcotic medication. Dr. Hijazi asserted that at some point plaintiff's pain increased, so he kept increasing her pain medication until he could no longer do so. He noted that plaintiff lost her insurance coverage and was unable to proceed with injections, but he would have continued to recommend injections and other pain management procedures if she had been able to afford them. He indicated that he stopped prescribing Duexis when she lost her insurance.

Dr. Hijazi testified that his diagnosis was disc herniation with radiculopathy, cervical spine stenosis (a consequence of the disc herniation), facet arthropathy, and cervical and lumbar facet arthropathy. In his opinion, the disc herniation was most likely caused by the January 20, 2017 accident. He was able to give that opinion to a reasonable degree of medical certainty. Dr. Hijazi testified that all of the treatment he provided to plaintiff and all of the medications he prescribed had been necessitated by the January 20, 2017 accident.

Dr. Hijazi testified regarding his plan for plaintiff's pain management. He asserted that she would benefit from epidural injections for her shooting pain down the arms and from facet treatments and radiofrequency ablations for her facet joint pains in the lower back and neck. He explained that the cervical injections should be done based on her symptoms. Dr. Hijazi recommended up to three cervical epidural steroid injections per year, up to two cervical radiofrequency ablations per year for eight years, and two lumbar ablations per year for eight years. He explained that Dr. Almubaslat's recommendation of an "ACDF" fusion would help for the levels treated but would not help for the levels above and below. He stated

that fusion might increase degeneration above and below the fusion, and therefore, plaintiff might need more facet treatments in the future. Dr. Hijazi said he started her treatment in April of 2017 and that her last treatment was in July of 2019.

Dr. Almubaslat, who was accepted as an expert in the field of neurosurgery, testified that he first saw plaintiff on August 7, 2017, and that he last saw her on September 18, 2017. He further testified that during the first visit, plaintiff complained of neck pain; pain coming down to the left shoulder; pain coming down her arm, forearm, and hand; and numbness, tingling, and weakness in her left arm and hand. He asserted that these were the traditional symptoms of nerve compression or spinal cord compression. Dr. Almubaslat stated that plaintiff said she had some improvement in the pain following treatment but that the pain was coming back, and the weakness was getting worse. He said that the MRI report indicated that plaintiff had significant degenerative changes, disc disease, disc herniation, disc protrusion, disc extrusion, spondylosis, and stenosis. Dr. Almubaslat testified that plaintiff's symptoms during her clinical presentation were consistent with what he saw on her MRI.

It was Dr. Almubaslat's opinion that the extruded discs at C3-4 and C7-T1 were completely new injuries caused by the January 20, 2017 accident. It was also his opinion that the other levels became symptomatic because of the accident. Dr. Almubaslat testified that he was able to give those opinions to a reasonable degree of medical certainty. He stated that he believed the January 20, 2017 accident more likely than not caused plaintiff's disc injuries because she was able to work before but not after the accident; she had no symptoms or treatment for her cervical spine before the accident, but afterward there were abrupt, significant changes in her symptoms and treatment; the extruded disc seen on the MRI very highly correlated with a traumatic event; and there was consistency between the MRI and her symptoms.

7

Dr. Almubaslat further testified that he recommended a C3-4 and C4-5 surgery to remove pressure on both of those discs and fuse the spine, which he explained was referred to as an "ACDF"—an anterior cervical discectomy fusion. He explained that those levels were the ones definitely causing stenosis and were the most dangerous because C3-4 was pressing on the spinal cord. As such, he believed those levels needed to be addressed immediately. Dr. Almubaslat noted that there was the risk of fusion failure if the bone did not grow. He testified that after a period of recovery, if plaintiff still had symptoms at C7-T1, then he would recommend a second surgery, which could involve one, two, or three levels. Dr. Almubaslat explained that plaintiff had significant findings at all five levels but that it would be too dangerous to operate on all five discs at the same time. He testified that more likely than not plaintiff would also need surgery at C7-T1 at some point in time. He noted that there was pretty significant compression at that level. Dr. Almubaslat indicated that there was a risk of paralysis if plaintiff did not get the first or second surgeries. It was his opinion that the first and the second surgeries "were made reasonably medically certain" by the January 20, 2017 accident.

Dr. Aaron Wolfson, who was accepted as an expert in life care planning and vocational rehabilitation, testified that he was asked to determine how the accident and injuries affected plaintiff's ability to work and what future medical care plaintiff would require as a result of the accident. He further testified that he calculated those costs throughout her life expectancy after meeting with Ms. Jackson, reviewing her medical records, talking to Dr. Almubaslat and Dr. Hijazi, reviewing their depositions, and researching costs to obtain a range from the least to the most expensive. Defense counsel moved Dr. Aaron Wolfson's life care plan research worksheet into evidence, and plaintiff's counsel moved Plaintiff's Exhibit

8

Book, which contained Dr. Aaron Wolfson's report dated July 26, 2019, into evidence.[3]

Dr. Shael Wolfson, who was accepted as an expert in the field of forensic economics, testified that he was asked to provide estimates of economic loss regarding plaintiff's wages[4] and to take Dr. Aaron Wolfson's life care plan and calculate the present value of the medical costs. Plaintiff's counsel moved Dr. Shael Wolfson's report and calculations into evidence.

The pertinent figures from that report are as follows:

|  | Lower | Upper |
|---|---|---|
| Future Medical Care | $ 23,999 | $ 54,515 |
| Projected Evaluations | $ 925 | $ 1,095 |
| Therapeutic Modalities | $ 345 | $ 810 |
| Laboratories/Diagnostics | $ 684 | $ 1,995 |
| Surgeries/Procedures | $443,463 | $1,183,362 |
| Medications | $710,938 | $1,111,289 |
| Equipment and Supplies | 169 | $ 908 |
| Household Upkeep | $ 11,960 | $ 16,560 |
| Total | $1,192,483 | $2,370,534 |

Midpoint figures were also provided. Two of these categories were further broken down. The surgeries/procedures included: cervical epidural steroid injections—$9,019 to $342,417; cervical radiofrequency ablation—$38,593 to $156,226; bilateral lumbar facet blocks—$3,742 to $8,546; two-level ACDF—$179,583 to $219,271; and three-level ACDF—$161,706 to $234,620. The medications included: hydrocodone—$33,396 to $35,522, and Duexis—$677,541 to $1,075,768.

Ms. Stewart testified that she was the Director of Housekeeping at the Hilton New Orleans Airport and had been Ms. Jackson's direct supervisor for two-and-a-half years. She explained that Ms. Jackson's job entailed cleaning the public space

---

[3] Dr. Aaron Wolfson's report indicates that the expectation of remaining life at age sixty-two for women is twenty-three years. The record reflects that plaintiff's date of birth is January 12, 1957, making her sixty years old at the time of the accident.

[4] These figures are not provided because defendants do not challenge them on appeal.

area as a lobby attendant, which involved a lot of pushing, pulling, and lifting. She further testified that Ms. Jackson worked at the Hilton for a total of twenty-five to thirty years and was an "awesome" employee.

Mr. Davis testified that he and Ms. Jackson had been friends for fifteen years. He further testified that after the accident, Ms. Jackson was in a lot of pain, which never improved. Mr. Davis asserted that before the accident, Ms. Jackson was a "happy-go-lucky" person, but afterwards she was a moody person who missed her job and did not have the drive to engage in activities any longer. Ms. Armour testified that Ms. Jackson was her sister. She further testified that since the accident, Ms. Jackson, was always sad and in pain. Ms. Armour noted that Ms. Jackson was not the same person after the accident as she was before the accident.

After plaintiff rested her case, the defense called Dr. Tender, who was accepted as an expert in the field of neurosurgery. Dr. Tender testified that he was asked to see Ms. Jackson for a neurosurgical opinion, after which he performed an independent medical examination (IME) on her and reviewed her medical records. Dr. Tender further testified that only plaintiff's C3-4 and C4-5 discs were symptomatic, and he recommended addressing only those levels with an anterior cervical discectomy and fusion. He thought surgery at those two levels was a treatment option but not mandatory. He did not believe that C7-T1 was causing plaintiff's radiculopathy, and therefore, he stated that he would not address the lower three levels mentioned by Dr. Almubaslat. Dr. Tender explained that the disc herniation at C7-T1 was on the right and that it would press on the C8 spinal nerve, which would impact certain fingers and the side of the hand but that plaintiff did not describe that kind of pain. He also explained that a five-level fusion was a major undertaking that was not indicated and that she would barely be able to move after such a fusion. Dr. Tender testified that plaintiff's pathology was clearly degenerative rather than traumatic in nature, and therefore, unlikely to have been

10

caused by any accident; however, he noted that plaintiff's symptoms seemed to have been aggravated by the January 20, 2017 accident.

The defense also called Ms. Nunez as a witness. Ms. Nunez, who was accepted as an expert in the fields of life care planning and vocational rehabilitation, testified that she was asked to perform a vocational assessment and a life care plan for plaintiff. She further testified that she met with Ms. Jackson, spoke to Dr. Tender, and reviewed medical records. Ms. Nunez stated that she prepared a report, which contained the following medical projection costs as recommended by Dr. Tender in pertinent part:

| Medical Service/Item | Frequency | Average One-Time Cost |
|---|---|---|
| ACDF – two-level | Once | $113,006.67 |
| Neurosurgeon | 4 times after surgery | $ 880.00 |
| Cervical CT scan | Once | $ 475.00 |
| Physical Therapy Evaluation | Once | $ 128.33 |
| Physical Therapy | 2-3 times per week for 6-8 weeks | $ 1,487.50 |
| Vicodin 10/325 mg. | 1 every 4-6 hours for 3 months | $ 512.61-$765.15 |
| OTC anti-inflammatory | 1 every 4-6 hours | Average annual cost - $115.20-$172.80 |
| | | |
| Total | | $116,490.11-$116,742.32 |

Defense counsel moved Ms. Nunez's report into evidence.

At the conclusion of the trial, the jury rendered judgment in favor of plaintiff and against defendants and awarded plaintiff damages in the following amounts:

| | |
|---|---|
| Past Medical Expenses | $ 24,946.24 |
| Past Loss of Earnings | $ 82,163.00 |
| Future Medical Expenses | $1,100,000.00 |
| Future Loss of Earnings | $ 150,083.00 |
| Past Pain and Suffering, Mental Anguish | $ 150,000.00 |
| Past Loss of Enjoyment of Life | $ 50,000.00 |
| Future Pain and Suffering, Mental Anguish | $ 50,000.00 |
| Future Loss of Enjoyment of Life | $ 25,000.00 |
| | |
| Total Damages | $1,632,192.24 |

11

The trial court entered a judgment on the jury verdict on September 11, 2019. On September 18, 2019, defendants filed Defendants' Motion for Judgment Notwithstanding the Verdict or Alternatively for a New Trial that was denied on November 15, 2019. The trial court found that "reasonable minds could have arrived at the verdict handed down in this case."

Defendants and plaintiff have appealed the jury's verdict.

**STANDARD OF REVIEW**

In reviewing findings of fact, appellate courts employ a "manifest error" or "clearly wrong" standard of review. *Antill v. State Farm Mut. Ins. Co.*, 20-131 (La. App. 5 Cir. 12/2/20), 308 So.3d 388, 401-02 (citing *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989)). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are more reasonable. *Id.* Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* While an appellate court must review the conclusions in light of the entire record, it "must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently." *Antill v. State Farm Mut. Ins.*, *supra* (citing *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996, 1007).

**DISCUSSION**

**Defendants' Assignment of Error Number One**

In the first assignment of error, defendants argue that the jury's award of $1,100,000 in future medical expenses is grossly excessive and not supported by medical evidence showing that the expenses are necessary and inevitable. They assert that there were improperly supported items in plaintiff's life care plan, including two neck surgeries and alternative courses of treatment that should be

12

obviated by surgery; a second neck surgery involving three levels even though Dr. Almubaslat had "no idea" how many levels might be involved; pain medication inflated by several hundred thousand dollars resulting from a miscalculation by Dr. Wolfson regarding the cost of Duexis; epidural steroid injections with a cost estimate ranging from $8,178 to $310,500, with the large range driven by what Dr. Wolfson admitted was contradictory information presented by Dr. Hijazi about desired frequency; interventional procedures for which Dr. Hijazi failed to provide the number of spinal levels involved leaving Dr. Wolfson, a non-medical doctor, to guess at medical recommendations for cost purposes; extensive treatment recommended to plaintiff years ago that she avoided for a lot of reasons according to Dr. Hijazi; routine neurosurgical care that Dr. Wolfson admitted should be removed from the life care plan once plaintiff has her recommended surgery; and $45,885 in compliance drug testing based on the assumption, which was contradicted by Dr. Hijazi, that plaintiff will be on narcotics for the rest of her life.

Defendants argue that when these unsupported items are eliminated from consideration, the life care plan does not support anything approaching $1,100,000 in future medical expenses. They ask this Court to either reduce plaintiff's future medical expenses to an amount not to exceed $263,016.44, which they argue is the highest award that could conceivably be justified, and remand to the trial court for an appropriate adjustment in judicial interest, or remand for a new trial on the issue of damages with all costs assessed to plaintiff.

Plaintiff responds that the award of $1,100,000 in future medical expenses is not reversible error because evidence introduced during trial supports multiple combinations of future treatment that exceed that figure. She further responds that defendants cannot complain about the calculations included in Dr. Wolfson's life care plan when they themselves moved these documents into evidence.

13

Plaintiff contends that the jury could have properly determined that her condition stabilized under the pharmacological plan and awarded $1,100,000 for prescriptions and related treatment without any awards for future surgeries or pain management procedures. She asserts alternatively that the jury could have properly awarded $1,100,000 in future medical expenses by calculating the cost of the first cervical surgery, lumbar pain management procedures, cervical radio frequency ablations, and some low amount of prescriptions. Plaintiff further asserts that the jury could have calculated $1,100,000 in future medical expenses by awarding her the costs of both cervical surgeries, lumbar injections, and the lowest recommended prescription drug costs. She also contends that the jury could have calculated $1,100,000 in proper future medical expenses using some other combination of treatment because none of the parties proposed a jury interrogatory that included any breakdown of future medical expenses by type.

Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. *Mendoza v. Mashburn*, 99-499, 99-500 (La. App. 5 Cir. 11/10/99), 747 So.2d 1159, *writ denied*, 00-37 (La. 2/18/00), 754 So.2d 976. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expense will be medically necessary. *Menard v. Lafayette Ins. Co.*, 31 So.3d at 1006. "Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost." *LeMasters v. Boyd Gaming Corp.*, 04-1054 (La. App. 5 Cir. 2/15/05), 898 So.2d 497, 503, *writ denied*, 05-751 (La. 5/6/05), 901 So.2d 1103.

An award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty and generally turns on questions of credibility and inferences. *Menard v. Lafayette Ins. Co.*, 31 So.3d

14

at 1006-08. Before reversing a jury's conclusions of fact, an appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. *Guillory v. Ins. Co. of N. Am.*, 96-1084 (La. 4/8/97), 692 So.2d 1029, 1032. Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. *Green v. K-Mart Corp.*, 03-2495 (La. 5/25/04), 874 So.2d 838, 843. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. *Id.*

When a trier of fact assesses special damages, the discretion is more limited or narrower than the discretion to assess general damages. *Dufrene v. Gautreau Family, LLC*, 07-467, 07-547 (La. App. 5 Cir. 2/22/08), 980 So.2d 68, 83, *writs denied*, 08-629 (La. 5/9/08), 980 So.2d 694 and 08-628 (La. 5/9/08), 980 So.2d 698. The standard of review, however, is still that of abuse of discretion. *Id.*

In the instant case, plaintiff and defendants presented very different life care plans at trial. Dr. Aaron Wolfson, plaintiff's expert in life care planning and vocational rehabilitation, testified that he calculated the costs of plaintiff's future medical care after meeting with plaintiff, reviewing her medical records, talking to Dr. Almubaslat and Dr. Hijazi (her treating physicians), reviewing their depositions, and researching costs. His life care plan contained the costs for plaintiff's future medical care, which included projected evaluations, therapeutic modalities, laboratories/diagnostics, surgeries/procedures, medications (hydrocodone and Duexis), equipment/supplies, and household upkeep. Dr. Shael Wolfson, plaintiff's expert in forensic economics, took Dr. Aaron Wolfson's life care plan and calculated the present value of the medical costs, providing lower, mid-point, and upper ranges. The lower range was $1,192,483; the mid-point range was $1,781,508; and the upper range was $2,370,534.

15

Stacie Nunez, defendants' expert in life care planning and vocational rehabilitation, testified that she calculated the costs of plaintiff's future medical care after speaking to Dr. Gabriel Tender, defendants' neurosurgery expert who performed an IME on plaintiff, and after reviewing plaintiff's medical records. Her life care plan contained the costs for plaintiff's future medical care, which included an ACDF two-level surgery, neurosurgeon fees, a cervical CT scan, a physical therapy evaluation, physical therapy, and medication (Vicodin and anti-inflammatories). Ms. Nunez provided a range of $116,490.11 to $116,742.32.

After listening to the testimony and considering both life care plans, the jury clearly believed plaintiff's witnesses and awarded plaintiff $1,100,000 in future medical expenses. That award was $92,483 less than the most conservative amount in the life care plan prepared by plaintiff's experts but far more than the amount in the life care plan prepared by defendants' expert.

It is impossible for us to determine how the jury decided to award the $1,100,000, since it was not asked to award future medical expenses by category. Nevertheless, the evidence admitted at trial supports multiple combinations of future treatment. The jury may have awarded plaintiff money for medications and other expenses without any award for surgeries or alternative treatments, or it may have awarded money for the first surgery and some alternative treatments and medications. Or, the jury may have awarded money for both surgeries and some medications, or it may have awarded money for most of the expenses in the upper range except for Duexis. Or, the jury may have awarded plaintiff money for all of the surgeries and alternative treatments and some of the medications in the lower range in the event that the surgeries failed, which Dr. Almubaslat admitted could occur. There are several other combinations of future medical treatment expenses that the jury could have properly awarded as well.

16

On appeal, defendants specifically challenge the high-priced items in Dr. Aaron Wolfson's life care plan, which include the two neck surgeries, the alternative courses of treatment (steroid injections, facet blocks, and radiofrequency ablations), and the medications. Defendants argue that the costs for alternative courses of treatment should be obviated by the two neck surgeries; however, Dr. Hijazi indicated that plaintiff might need some alternative courses of treatment based on her symptoms even if she has the first surgery. He explained that the first surgery would help with the levels treated but would not help for the levels above and below.

Defendants also argue that the costs for Duexis, an anti-inflammatory medication, were improperly calculated by Dr. Wolfson; however, a review of the testimony reveals that those costs were properly calculated. Although Dr. Aaron Wolfson initially testified that Duexis costs $67 to $106 for thirty tablets, he then testified immediately thereafter that for one pill a day, the cost would be $24,436 to $38,799 per year. If those figures are divided by 365 days, the cost per pill would be approximately $67 and $106, respectively. Also, Dr. Aaron Wolfson testified that Dr. Hijazi stated in his deposition that if plaintiff had not lost her health insurance, he would have continued to prescribe Duexis because she was doing well on that medication.

Defendants further argue that costs for a second surgery should not be allowed because Dr. Almubaslat did not know if that surgery would be recommended and if so, whether it would be for one, two, or three levels. At trial, Dr. Almubaslat testified that it was more likely than not that plaintiff would need a second surgery at C7-T1 as there was significant compression at that level. It was his opinion that the first and second surgeries were made reasonably medically certain by the January 20, 2017 accident. A plaintiff does not have to prove that future surgery is "absolutely necessary" but only that such care is medically

17

necessary to correct conditions which presently exist. *Hoskin v. Plaquemines Parish Government*, 97-61 (La. App. 4 Cir. 12/1/97), 703 So.2d 207, 210-11, *writs denied*, 98-270, 98-271 (La. 4/3/98), 717 So.2d 1129. We find that plaintiff proved at trial that the first and second surgeries are medically necessary to correct conditions which plaintiff currently has.

In conclusion, the jury was presented with two life care plans and chose the plan prepared by plaintiff's experts. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. *Antill*, *supra*. We find no error in the jury's determination. Dr. Aaron Wolfson testified at length about his proposed life care plan and gave adequate reasons for the necessity and cost of its elements. We find that $1,100,000 is not an unreasonable award for the significant injuries and future life care sums testified to at trial. As such, we affirm the jury's award of future medical expenses.

**Defendants' Assignment of Error Number Two**

In the second assignment of error, defendants argue that the trial court erred by allowing the jury to be given irrelevant, inflammatory, and misleading evidence suggesting that the accident was the result of a hit and run by defendants. They contend that despite their admission of liability and general objection to all liability evidence by way of a motion in limine, the trial court erroneously allowed plaintiff to prove liability at trial. Defendants further contend that given that the collision was a low-speed one, it appeared that plaintiff insisted on presenting her case for liability in order to introduce other crimes evidence to smear them and prejudice the jury. They argue that the attacks on Mr. White, especially those related to accusations that he committed a hit and run, were unduly prejudicial. Defendants note that Mr. White did not testify at trial and was not prosecuted for hit and run.

Plaintiff responds that the trial court did not commit reversible error by accepting evidence of the events following the collision when that evidence was introduced by defendants and was needed to rebut multiple defense theories. She also asserts that testimony that Mr. White attempted a hit and run was necessary to rebut defendants' false narrative that the collision was a minor impact that he might not have even noticed. She further responds that defendants' motion in limine was flawed from the start because it was premised on the material misrepresentation that all parties joined in the stipulation. Plaintiff said she informed defendants that she did not agree to a stipulation regarding liability.

Plaintiff also points out that during Lieutenant Foret's testimony, defendants never objected to any question regarding the circumstances of the collision. She further states that defendants themselves moved the entire police report and supplemental investigation into evidence. Plaintiff argues that defendants cannot complain about evidence that they themselves moved into evidence and never objected to. She contends that even if the trial court erred by admitting the officer's testimony regarding Mr. White, which she denies, any error is harmless because the evidence was cumulative. Plaintiff also responds that she is allowed to present the totality of her case to the jury and that the facts of defendants' conduct and liability lends itself to proof of other elements of damages, such as fright, fear, and mental anguish.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible except as otherwise provided by positive law, and evidence which is not relevant is not admissible. La. C.E. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

19

misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. As a general rule, trial courts are afforded great discretion concerning the admission of evidence, and their decisions to admit or exclude evidence should not be reversed on appeal in the absence of an abuse of their discretion. *See Medine v. Roniger*, 03-3436 (La. 7/2/04), 879 So.2d 706; *Perniciaro v. Hamed*, 20-62 (La. App. 5 Cir. 12/16/20), 309 So.3d 813, 834.

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. La. C.E. art. 103(A). Erroneous evidentiary rulings are subject to a harmless error analysis. *Metairie Club Gardens Ass'n, Inc. v. Par. of Jefferson*, 16-139 (La. App. 5 Cir. 12/28/16), 209 So.3d 1071, 1077 (citing *Lapuyade v. Rawbar, Inc.*, 15-705 (La. App. 5 Cir. 04/13/16), 190 So.3d 1214, 1220, *writs denied*, 16-908 (La. 9/6/16), 199 So.3d 610 and 16-916 (La. 9/6/16), 199 So.3d 611; *Finch v. ATC/Vancom Mgmt. Srvs. L.P.*, 09-483 (La. App. 5 Cir. 01/26/10), 33 So.3d 215, 221). Moreover, where evidence is admitted that is merely cumulative of other evidence in the record, any error in its admission is harmless. *Id*.

In *Palmer v. Goudchaux/Maison Blanche, Inc.*, 588 So.2d 737, 740-41 (La. App. 5 Cir. 1991), *writ denied*, 590 So.2d 1186 (La. 1992), this Court upheld the trial court's ruling admitting evidence of the incident[5] even though the defendant stipulated to liability. In that case, the defendant argued that admission of the security camera videotape of the incident and still frames taken from the tape was error because its stipulation as to liability rendered the videotape irrelevant. Alternatively, the defendant argued that even if the videotape was relevant, its probative value was outweighed by its prejudicial effect, citing Article 403. This Court noted that the trial judge had reviewed the videotape and ruled it admissible

---

[5] A customer filed a personal injury action against the department store after he was injured in a physical altercation with a store security guard.

because he found it relevant to the issue of what damages the plaintiff suffered from this incident. Citing Article 103(A), this Court did not find that the trial judge abused his discretion in ruling that the videotape was relevant, noting that the plaintiff testified as to his version of events and that the videotape corroborated that version up to the point when the security guard reached him. This Court also found that the videotape was a visual recording of at least some of the events for which the plaintiff was seeking damages, and therefore, it was clearly relevant to the jury's determination of what actually transpired. As to the issue of prejudice, this Court found none that could possibly have outweighed the probative value of the videotape or otherwise adversely affected any substantial right of the defendant.

In the instant case, the record reflects that on August 9, 2019, defendants filed a Stipulation of Liability wherein they alleged that it was entered into by "all parties." Thereafter, on August 15, 2019, defendants filed a motion in limine to exclude any evidence of and reference to defendants' liability at trial. On August 20, 2019, plaintiff filed a motion to strike and for sanctions and an opposition to defendants' motion in limine. In her motion, plaintiff asserted that she did not agree to a stipulation of liability and argued that defendants falsely alleged that she entered into the stipulation. As such, plaintiff asked that the stipulation be stricken and that she be allowed to present her full case and prove all necessary elements of her damages to the jury.

According to the August 22, 2019 minute entry, defense counsel moved to have the stipulation for liability accepted, but plaintiff's counsel did not agree to the stipulation. After extensive argument, defense counsel moved to use the phrase "admission of liability" instead of "stipulation of liability," which the trial court accepted. Defense counsel then moved to exclude the testimony of the police officer. Following arguments of counsel, the trial court ruled that it would allow

21

the testimony of the police officer at trial. Defense counsel and plaintiff later agreed that defendants' admission of liability would be read to the jury. The trial court later read the admission to the jury.

During her opening statement, defense counsel said that she and plaintiff's counsel had very different ideas of how the accident happened and about plaintiff's injuries. Defense counsel stated that they did agree that this case was about a hit and run rear-end accident. She noted that Mr. White did not know at the time that he had made contact with plaintiff's vehicle. She told the jury to ask themselves, "What kind of impact was this accident?" and "What kind of injuries resulted from the accident, as opposed to what kind of injuries were predating the accident and not caused by it?"

Lieutenant Foret, the first witness at trial, testified regarding the facts and circumstances surrounding the accident. Defense counsel made two objections that were overruled which pertained to whether the truck had been recently washed and to the playing of the entire videotape of the accident. She did not object to questions regarding details of the accident. Nevertheless, even though defendants did not make contemporaneous objections at trial to the evidence in question, we will consider defendants' assignment since the trial court denied defendants' motion in limine. (*See State v. Parker*, 421 So.2d 834, 840 (La. 1982), *cert. denied*, 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983), where the Louisiana Supreme Court considered a defendant's other crimes challenge to events surrounding his arrest even though he did not make a contemporaneous objection to the testimony because the trial court had denied his motion in limine.)

After reviewing the facts of the instant case and pertinent jurisprudence, we find that the trial court did not abuse its discretion by admitting evidence that Mr. White engaged in a hit and run accident with plaintiff. First, the evidence was relevant, not to the issue of liability, but to the issue of what damages plaintiff

suffered from this accident. Second, the evidence was relevant to rebut the assertions made by defense counsel in her opening statement that Mr. White left the scene because he did not think he had struck plaintiff's vehicle. Third, even if the evidence was erroneously admitted, it was cumulative and therefore harmless, as the police report, which was admitted into evidence, contained details of the accident. Fourth, defense counsel herself moved the police report into evidence. Additionally, we find that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, and the admission of the evidence did not adversely affect a substantial right of defendant. *See* La. C.E. art. 103(A); La. C.E. art. 403; *Palmer v. Goudchaux/Maison Blanche, Inc.*, *supra*. Further, it is noted that although Lieutenant Foret testified that defendant was charged with hit and run, he later indicated that charge was dismissed.

This assignment is without merit.

**Plaintiff's Assignment of Error**

In her sole assignment of error, plaintiff argues that the jury ruled without reasonable basis when it awarded her only $75,000 for future pain and suffering when it simultaneously found that her injuries were severe enough to require more than a million dollars' worth of treatment following the trial. She further argues that the lowest award she could find in Louisiana was $350,000 in *Savant v. Hobby Lobby Stores Inc.*, 12-447 (La. App. 3 Cir. 11/7/12), 104 So.3d 567, where Savant underwent two separate neck surgeries, a single-level procedure followed by a three-level procedure. Plaintiff claims that the appellate court in *Savant* determined that $350,000 was the lowest possible reasonable figure. She asserts that in her case the figure would be $403,975 in today's money based on an annual inflation rate of 1.61%, citing *Pete v. Department of Corrections*, 17-1131 (La. App. 3 Cir. 5/9/18), 247 So.3d 1084. Plaintiff asks that her future general damages

23

be increased to $203,975 so that her total past and future general damages would be $403,975.

Defendants respond that plaintiff is not entitled to more than the $275,000 in general damages that the jury awarded to her. They further respond that *Savant* did not hold that $350,000 was the lowest amount of general damages that could be reasonably awarded in a two-level neck surgery. Rather, defendants argue that the appellate court held that the trial court did not abuse its discretion in awarding that much. Defendants also note that the fact pattern in *Savant* is very different from that of the instant case. Further, they contend that there are many other Louisiana cases involving multiple spinal surgeries where lower general damages were awarded than plaintiff received, citing *Monte v. State Farm Mut. Auto. Ins. Co.*, 13-979 (La. App. 3 Cir. 5/21/14), 139 So.3d 1139, which they said affirmed $200,000 in general damages to a plaintiff who underwent two separate cervical fusions.

General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." *Duncan v. Kansas City Southern Railway Co.*, 00-66 (La. 10/30/00), 773 So.2d 670 (citing *Keeth v. Dept. of Pub. Safety & Transp.*, 618 So.2d 1154, 1160 (La. App. 2 Cir. 1993)). Vast discretion is accorded the trier of fact in fixing general damage awards. *Duncan v. Kansas City Southern Railway Co.*, *supra* (citing La. C.C. art. 2324.1; *Hollenbeck v. Oceaneering Int., Inc.*, 96-377 (La. App. 1 Cir. 11/8/96), 685 So.2d 163, 172, *writ denied*, 97-493 (La. 4/4/97), 692 So.2d 421. This vast discretion is such that an appellate court should rarely disturb an award of general damages. *Duncan v. Kansas City Southern Railway Co.*, *supra* (citing *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260-61 (La.1993), *cert.*

*denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994)). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. *Id.*

The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. *Tamayo v. Am. Nat. Gen. Ins. Co.*, 14-130 (La. App. 5 Cir. 9/24/14), 150 So.3d 459, 470 (citing *Cone v. National Emergency Serv., Inc.*, 99-0934 (La. 10/29/99), 747 So.2d 1085, 1089; *Reck v. Stevens*, 373 So.2d 498 (La. 1979)). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. *Tamayo v. Am. Nat. Gen. Ins. Co.*, *supra* (citing *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La. 1976)).

The abuse of discretion standard of review applies when an appellate court examines a fact-finder's award of general damages. *Wainwright v. Fontenot*, 20-492 (La. 10/17/00), 774 So.2d 70, 74. The assessment of the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. *Id.*

In the instant case, the record reflects that the jury awarded plaintiff $50,000 in future pain and suffering and mental anguish, $25,000 in future loss of enjoyment of life, $150,000 in past pain and suffering and mental anguish, and $50,000 for past loss of enjoyment of life, for a total of $275,000 in general damages. Plaintiff argues that the $75,000 amount for future pain and suffering, mental anguish, and future loss of enjoyment of life was too low. However, the jury heard the testimony and considered the evidence. It could have reasonably found that plaintiff's pain and suffering would be less in the future after she had

25

the recommended surgeries and procedures and/or took the recommended medications. Based on our review of the testimony and the evidence, we find that the jury did not abuse its discretion in its general damage award. Therefore, we need not look to prior awards as suggested by plaintiff. Only after finding that the award constitutes an abuse of discretion is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. *See Tamayo v. Am. Nat. Gen. Ins. Co.*, *supra*.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment in this matter.

**<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **SEPTEMBER 29, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

*Curtis B. Pursell*

**CURTIS B. PURSELL**
CLERK OF COURT

# 21-CA-15

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE J. STERLING SNOWDY (DISTRICT JUDGE)
AUSTIN MARKS (APPELLEE)
MITCHELL J. HOFFMAN (APPELLEE)

MATTHEW D. HEMMER (APPELLEE)
FREDERIC C. FONDREN (APPELLANT)

PRZEMEK M. LUBECKI (APPELLEE)
GEORGE O. LUCE (APPELLANT)

**MAILED**
NO ATTORNEYS WERE MAILED